STATE OF NEBRASKA, APPELLEE, V. CON M. BRADLEY, APPELLANT.
461 N.W.2d 524

Filed October 19, 1990.    No. 89-360.

372

Tad D. Eickman and Lynn B. Lamberty, of Steinacher, Vosoba, Hanson & Eickman, for appellant.

Robert M. Spire, Attorney General, and Linda L. Willard for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

Defendant, Con M. Bradley, was, pursuant to verdict, adjudged guilty of first degree murder, in violation of Neb. Rev. Stat. § 28-303 (Reissue 1989), and the use of a firearm to commit a felony, in violation of Neb. Rev. Stat. § 28-1205

(Reissue 1989). He was thereafter sentenced to life imprisonment on the murder conviction and to imprisonment for 20 years on the use of a firearm conviction. In this appeal he assigns and discusses in his briefs 24 claimed errors which, in summary, combine to challenge the district court's rulings or conduct with respect to (1) Bradley's plea in abatement, (2) reciprocal discovery, (3) Bradley's absence during certain proceedings, (4) data relating to the State's witnesses, (5) venue, (6) seating and managing the jury, (7) endorsement of witnesses, (8) making the trial record, (9) admission of certain evidence, (10) sufficiency of the evidence, and (11) conduct of the prosecutor.

In addition, Bradley assigns six errors which he does not discuss in his briefs, namely, the district court's (1) method of selecting alternate jurors, (2) refusal to allow him to employ a pathologist, except for limited purposes, (3) overruling a motion in limine, (4) refusal to permit "continuing objections," (5) failure to include in its charge to the jury certain instructions he requested, and (6) pressuring him into testifying. Because this court ought not to both conceptualize arguments and sit in judgment of them, Neb. Ct. R. of Prac. 9D(1)d (rev. 1989) limits our review to claimed errors which are assigned and argued in an appellant's brief. Accordingly, we do not consider the six unargued assignments of error last listed above. *State v. Jolitz*, 231 Neb. 254, 435 N.W.2d 907 (1989); *State v. Broadstone*, 233 Neb. 595, 447 N.W.2d 30 (1989).

None of the 11 summarized assignments of error properly before us having merit, we affirm.

## II. FACTS

The victim, Kirk Glasgow, was a resident of Lincoln, Lancaster County, Nebraska, who disappeared after working his 3:30 p.m. to midnight shift at his place of employment in Crete, Saline County, Nebraska, on July 23, 1987. His remains, consisting only of bones, including the skull, were found by a farmer who was disking a field in the last-mentioned county on March 23, 1988. An autopsy of the remains revealed two bullet wounds to the skull, either of which could have been fatal.

At the time of his disappearance, the victim was involved in

divorce proceedings and was separated from his wife, Valerie Knobel Glasgow. The victim and his wife had two children, a son and a daughter who were, respectively, 4 and 2 years old. Although the wife had temporary custody of the children, they spent 3 days each week with the victim in addition to spending every other weekend with him.

The victim and his wife had agreed that the children would spend Friday, July 24, 1987, with him while the wife worked. When the wife arrived at the victim's residence that morning, she found no one present, but heard what she assumed to be a clock radio "buzzing or playing." She then attempted to contact her estranged husband throughout the weekend but failed to reach him, and on Monday, July 27, 1987, informed police that the victim was missing.

Bradley knew the victim and was also well acquainted with the victim's wife, having met her in 1976 while attending Doane College with her brother, Bruce Knobel. In May 1987, Bradley began visiting the victim's wife on a regular basis, both via telephone and in person. Indeed, Bradley had been sexually intimate with her on one occasion in May 1987. The victim's wife confided in Bradley concerning her personal affairs, including matters relating to problems she was having with her pending divorce. Bradley had spoken with the victim's wife via the telephone for approximately 40 minutes on the evening of July 23, 1987, and in a September 22, 1987, letter to Norwood Tillery professed his love for her.

Bradley possessed a federal firearms license, and he and Anthony Stacy had been partners in the business of buying and selling firearms. Bradley had also, prior to his conviction in this case, purchased stolen military equipment from Stacy. The State's evidence linking Bradley to the victim's murder was based primarily upon Stacy's in-court testimony and upon the tape recording of a telephone conversation between Bradley and Stacy.

Although he was unable to remember the specific date, Stacy testified that he was visiting Bradley at the latter's home one night in July 1987 and that during this visit, the two discussed "[f]irearms, life, girls, just everything in general." During this discussion, Bradley told Stacy that he (Bradley) "got rid of

Valerie's husband." Stacy testified: "[Bradley] told me that he had taken the individual out in the field and shot him in the head and shot him two or three more times to make sure he was dead."

According to Stacy, Bradley admitted that he had "planned everything," that "everything went just like he planned," and that he killed the victim because he was "harassing" his estranged wife. Stacy also testified that Bradley "used the excuse of the [victim's] buying a car to go over to his house to see him." Robert Carnes, a shift superintendent where the victim was employed, testified that he had sold the victim a car on July 23, 1987.

Bradley also told Stacy that he had used a "faded" Smith & Wesson revolver to kill the victim. Stacy knew the gun to which Bradley was referring because the "bluing" on that gun had been "rubbed off," so that "about 90 percent or so of it looked like a nickel gun instead of a blue color gun." Stacy testified that in August 1987, as requested by Bradley, he retrieved the alleged murder weapon from a house where Bradley had previously lived and gave it to Bradley's brother. The weapon was eventually recovered by law enforcement officials and identified by Stacy at trial.

Stacy also testified that he was told by Bradley that the latter had inserted a small file into the barrel of the revolver to distort the rifling. The State's ballistics expert found evidence of "gouging . . . or scratching toward the muzzle area of the weapon . . . ." According to this witness, a bullet found in the victim's skull and another bullet recovered from the field in which the victim's remains were found could have been fired by the weapon which the police recovered, but the witness could not state with certainty whether these bullets in fact had been fired from that weapon.

Stacy originally denied any knowledge of Bradley's involvement in the victim's murder, testifying that such denial was motivated by his concern that his own wife would leave him if she discovered that he possessed unreported information concerning a homicide, and by his fear of being implicated in an attempted robbery and the theft by him of military equipment. However, when questioned by law enforcement officials on

June 26, 1988, Stacy informed them that Bradley had admitted killing the victim. Stacy then telephoned Bradley in the presence of the police and allowed them to record the conversation. Stacy also telephoned Bradley on July 27, 1988, again allowing the police to record the conversation.

During the course of the taped telephone conversations, Stacy and Bradley discussed the police investigation of the victim's murder. At one point during the July 27 taped conversation, Bradley indicated that he knew "exactly" what type of bullet was used to kill the victim.

The record contains evidence that after the police investigation began to focus upon Bradley as a primary suspect in the victim's murder, Bradley unsuccessfully attempted to use some of his acquaintances to fabricate an alibi.

## III. ANALYSIS

We consider in turn each of the 11 summarized assignments of error Bradley discussed in his briefs, as enumerated in part I above.

### 1. PLEA IN ABATEMENT

We first deal with the claim that the district court erred in overruling the plea in abatement Bradley filed on September 12, 1988. Any error in ruling on a plea in abatement is cured by a subsequent finding at trial of guilt beyond a reasonable doubt which is supported by sufficient evidence. *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Carter*, 226 Neb. 636, 413 N.W.2d 901 (1987); *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987). Thus, the deciding issue is whether the evidence was sufficient to support the conviction, a matter analyzed and resolved against Bradley in part III(10) below.

### 2. RECIPROCAL DISCOVERY

Next, we consider the assertion that the district court erred in granting the State's motion for reciprocal discovery, in threatening to withhold a portion of Bradley's attorneys' fees if they should fail to comply with the reciprocal discovery order, and in overruling his motion for limitation of reciprocal discovery.

Before trial, Bradley filed a motion for discovery requesting

production of all statements of any witnesses the State expected to testify at trial, along with other documents and reports relating to the criminal investigation concerning him. The State then filed a motion for reciprocal discovery of information and material in the possession of Bradley's attorneys, and the district court granted both motions, noting that issues relating to the work product of Bradley's attorneys could be raised separately.

Bradley later moved to limit reciprocal discovery. In response to this motion the district court stated:

> For the record, let the Court announce a rule that he believes should be followed and until such time as the Court is shown otherwise — the rule of the Court is that the defense requirement of reporting the result — results and details of their investigations to the prosecutor's office is very limited.

> The Court believes that they are not required to disclose to the prosecution new evidence or evidence that they've discovered which indicates that the defendant is guilty.

> But the Court believes that anything that the defendant discovers and which will be used at trial must be disclosed to the prosecutor. The Court has no idea how to enforce such a rule except to say that in the event that we are close to trial, close to the trial date or we are at trial and the defendant discloses or uses evidence unknown to the prosecutor's office, and if the prosecutor asks for time and is justified in doing so, asks for the time to investigate the matter which requires delay in the trial, from that point on counsel for the defendant will have to work without pay.

Bradley asserts that the district court's threatened sanction deprived him of his rights to effective assistance of counsel and to equal protection and that the threatened sanction was not justified by statute. While no such sanctions were ever imposed, Bradley nevertheless argues that their absence makes no difference "because the threat of sanctions created an unreasonable conflict between defense counsel and their client." Reply brief for appellant at 11.

In resolving this summarized assignment of error and many of those which follow, we are bound by the rule that if there is

some incorrect conduct in a jury trial which, on a review of the entire record, did not materially influence the jury in its verdict adverse to a substantial right of the defendant, the error is harmless. *State v. Thompson*, 231 N.W.2d 771, 438 N.W.2d 131 (1989); *State v. Olsan*, 231 Neb. 214, 436 N.W.2d 128 (1989); *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988). A conviction will not be set aside in the absence of a showing that a nonevidential error prejudiced the defendant. See, *State v. Boppre, supra*; *State v. Rowland*, 234 Neb. 846, 452 N.W.2d 758 (1990); *State v. Chapman*, 234 Neb. 369, 451 N.W.2d 263 (1990). Actual prejudice must be shown, rather than merely the possibility of prejudice. *State v. Peery*, 223 Neb. 556, 391 N.W.2d 566 (1986).

In attempting to show that he in fact was prejudiced by the district court's actions, Bradley states in his reply brief that his attorneys surrendered to the State reports which were compiled by his court-appointed defense investigator. Bradley then directs us to the State's cross-examination of Patricia Harrison, a former neighbor of the Glasgows', wherein Harrison states her belief that the victim was using the issue of custody over his two children as leverage against his estranged wife during the course of their divorce proceedings, and cites the following exchange:

Q. Is that — that would be what you told the private investigator that was helping the defense in this case, is that right?

A. I may have, I don't remember.

Q. You told her that [the victim] was using the kids as leverage?

A. That I felt that way, yes, I did.

Bradley asserts that this exchange shows that he was harmed by the State's receipt of his investigator's reports.

We first note that there is nothing in the record to show the source of the State's knowledge of what Harrison had told the investigator for the defense. However, we assume for the purpose of our analysis that the State learned what Harrison had previously told the investigator as a result of the review of the defense investigator's report rather than as a result of its own investigation.

Nevertheless, the testimony which Bradley cites merely duplicates prior testimony given by the victim's wife. The improper admission of evidence constitutes harmless error where the evidence is cumulative and there is other evidence to support the conviction. *State v. Rowland, supra*; *State v. Chapman, supra*. While the district court's threatened sanction might very well, under some circumstances, result in a deprivation of a defendant's rights, and for that reason appears an unwise ploy, the record before us fails to illustrate that the proceedings in this case were materially affected either by the court's granting of reciprocal discovery or by its threatened sanction. Thus, Bradley has failed to show that he was prejudiced thereby.

### 3. ABSENCE

The third summarized assignment of error arises from the fact that as the result of a separate conviction on an unrelated charge, Bradley was in the custody of the Nebraska Department of Correctional Services at Lincoln from the time of his arraignment in this case through the trial and the sentencing hearing. Thus, in order for him to be present in Saline County, where the proceedings involved were conducted, it was necessary for the district court to issue an order directing the Department of Correctional Services to transport Bradley to that county.

Bradley filed motions asking that he be present at all hearings, in camera meetings, and depositions. The district court declined to issue such a blanket order and refused to issue an order requiring that Bradley be transported to Saline County to facilitate his attendance at a hearing on a motion for a change of venue and an application for funds to retain a public opinion expert who would conduct a survey in support of a change of venue motion. The district court further refused to issue an order facilitating Bradley's attendance at Stacy's pretrial deposition. Bradley argues that the district court's failure to allow his presence during these proceedings violated his rights under the sixth amendment to the U.S. Constitution.

It is true that an accused has the right to be present at all stages of the trial when the accused's absence might frustrate the

fairness of the proceedings. However, the sixth amendment does not require the presence of the accused at every pretrial hearing. *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981). See, also, *U.S. v. Gerena*, 683 F. Supp. 330 (D. Conn. 1988).

Regarding Bradley's argument with respect to the hearing on his application for funds to retain a public opinion expert and the contemporaneous hearing on his change of venue motion, this court, in *State v. Anderson and Hochstein, supra*, held that the defendants' absence did not frustrate the fairness of the proceedings when their attorneys were arguing matters of law before the court. Here, in Bradley's absence, his attorneys argued legal issues relating to the change of venue motion. It is apparent that Bradley's absence did not affect the fairness of those proceedings.

Bradley also contends that he should have been allowed to attend Stacy's deposition. We, however, are aware of no authority for the proposition, nor has any been cited to us, that a defendant must be allowed to confront his accuser during all discovery proceedings when that witness also testifies at trial. Bradley was, of course, present when Stacy testified at trial. Consequently, Bradley was afforded his sixth amendment right to confront his accuser.

## 4. WITNESS DATA

The fourth summarized assignment of error alleges Bradley was prejudiced in the preparation of his defense by the district court's failure to require the State to reveal the criminal records of its witnesses.

Prior to trial, Bradley filed a motion requesting that he be given access to any information which would be available to the State regarding the criminal records of its witnesses. This motion was sustained in part by the district court. However, the State's attorney reported that he was unable to obtain witnesses' criminal records from the Nebraska State Patrol and other investigative agencies in the absence of either an active criminal investigation of a witness or a court order calling for disclosure of criminal records of witnesses specified in the

order. Bradley's attorneys then stated that they would prepare such an order for issuance by the court, but the record contains no evidence that such an order was ever presented to the court, and, thus, Bradley cannot now complain that no such order was entered.

At any rate, the issue which Bradley attempts to raise would not be one which would require a reversal of his conviction, for he again, either by means of evidence in connection with his motion for new trial or otherwise, fails to show any prejudicial effect of his failure to acquire the records in question.

## 5. VENUE

By the fifth summarized assignment of error, Bradley quarrels with the district court's refusal to provide him with funds to employ a pollster to study the effect of pretrial publicity on potential jurors and with the overruling of his motion for a change of venue.

The pollster question was recently addressed in *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990), wherein we reaffirmed the proposition that the refusal of a trial court to grant a motion for a public opinion poll rests within the court's discretion, and observed that voir dire examination is the better, more probative forum for ascertaining the existence of community and individual prejudice or hostility toward the accused.

Bradley, without meaningful citation to the record, claims that 21 of the 63 persons questioned during the voir dire examination were removed for cause and that 8 of the 63 examined were removed because they had formed an opinion about Bradley's guilt prior to being questioned. Even accepting those claims as true, they fall far short of establishing that the district court abused its discretion in denying Bradley funds for a public opinion poll.

Bradley also contends that as applied by this court, Nebraska's statute concerning venue changes in criminal cases, Neb. Rev. Stat. § 29-1301 (Reissue 1989), conflicts with the due process requirements of the federal Constitution, and the district court thus erred in denying him a change of venue. Bradley urges that the requirement of § 29-1301 that crimes be

prosecuted in the county where the offense was committed unless "a fair and impartial trial *cannot* be had therein" ·(emphasis supplied), coupled with this court's rulings that the issue is addressed to the trial court's discretion and that an abuse of discretion occurs "where a defendant establishes that local conditions and pretrial publicity make it *impossible* to secure a fair trial" (emphasis supplied), *State v. Boppre, supra* at 936, 453 N.W.2d at 420, conflicts with the standard set forth by the U.S. Supreme Court in *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966), which states: "[W]here there is a *reasonable likelihood* that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." (Emphasis supplied.)

However, notwithstanding that the *Sheppard* community had been saturated with "inherently prejudicial publicity" and "disruptive influences in the courtroom," 384 U.S. at 363, in deciding that Sheppard had been denied a fair trial, the U.S. Supreme Court relied not on the attendant pervasive publicity alone but on the totality of the circumstances, stating: "While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which the trial was held." *Sheppard, supra* at 384 U.S. at 354-55.

Considering the fact that the *Sheppard* Court specifically noted its decision was not based on the existence of pretrial publicity, it becomes clear that the "reasonable likelihood" language on which Bradley places such heavy reliance is not entitled to the weight he would like to have us give it. In point of fact, a later decision of the U.S. Supreme Court leads to the conclusion that in its view, as we said in *State v. Boppre, supra,* voir dire examination provides the best opportunity to determine whether venue should be changed. In *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975), the Court referred to three cases which, in reversing trial court convictions, presumed the existence of prejudice. Of these, only *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), was decided on the basis that the pretrial publicity

was so pervasive and prejudicial that a presumption of denial of due process was warranted. The other two cases, *Sheppard, supra,* and *Estes v. Texas,* 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), were decided on the totality of the "carnival atmosphere" present.

*Rideau,* on the other hand, involved the sound filming and subsequent repeated televised broadcasts of the defendant's "confession" during a custodial encounter with the sheriff. The *Rideau* Court viewed this circumstance as sufficient to mandate a change of venue without an examination of the voir dire process, saying:

> For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

(Emphasis in original.) *Rideau, supra* at 373 U.S. at 726.

The *Murphy* case drew extensive local and national attention because the defendant was a nationally known thief who had been convicted of a murder and a federal securities violation while awaiting trial on burglary-related charges in Dade County, Florida.

> The events of 1968 and 1969 drew extensive press coverage. Each new case against petitioner was considered newsworthy, not only in Dade County but elsewhere as well. The record in this case contains scores of articles reporting on petitioner's trials and tribulations during this period; many purportedly relate statements that petitioner or his attorney made to reporters.

*Murphy, supra* at 421 U.S. at 796.

Despite such extensive pretrial publicity, the U.S. Supreme Court did not apply *Sheppard's* "reasonable likelihood" test, as Bradley asserts should be done in this case. Instead, in holding that no change of venue was mandated, the *Murphy* Court examined the voir dire selection process. It reasoned that "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved," *Murphy, supra* at 421 U.S. at 799-800,

and concluded that "[t]he *voir dire* in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that *could not* be laid aside." (Emphasis supplied.) 421 U.S. at 800.

In adhering to our previous view, we are not unmindful that notwithstanding *Murphy*, some states have given the *Sheppard* language overriding importance and have adopted the method of analysis Bradley espouses. E.g., *Martinez v. Superior Court of Placer County*, 29 Cal. 3d 574, 629 P.2d 502, 174 Cal. Rptr. 701 (1981); *State v. Smith*, 58 Or. App. 458, 648 P.2d 1294 (1982). Indeed, California has gone so far as to change its venue statute by replacing the "cannot" language common to such enactments with the "reasonable likelihood" language found in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Cal. Penal Code § 1033 (West 1985). Other states, however, share our view. E.g., *Brown v. State*, 601 P.2d 221 (Alaska 1979); *People v. McCrary*, 190 Colo. 538, 549 P.2d 1320 (1976).

That ours represents the better reasoned view is further supported by the like application the federal courts make of Fed. R. Crim. P. 21(a), which provides that a change of venue may be had "if the court is satisfied that there exists . . . so great a prejudice against the defendant that the defendant *cannot* obtain a fair and impartial trial at any place fixed by law for holding court in that district." (Emphasis supplied.) E.g., *United States v. Buttorff*, 572 F.2d 619 (8th Cir. 1978); *United States v. Brown*, 540 F.2d 364 (8th Cir. 1976); *United States v. Delay*, 500 F.2d 1360 (8th Cir. 1974). But cf., *United States v. Marcello*, 280 F. Supp. 510 (E.D. La. 1968). It is also significant that the "cannot" language present in the rule at the time *Sheppard* was decided has not been changed.

Since we conclude that Bradley's constitutional argument is without substance, we move to a determination of whether the denial of his motion for change of venue was correct under Nebraska law. The factors to be considered in determining whether a change of venue is required due to pretrial publicity include the nature of the publicity, the degree to which the publicity has circulated in the area to which venue could be changed, the length of time between the dissemination of the

publicity complained of and the date of trial, the care exercised and ease encountered in selection of the jury, the number of challenges exercised during voir dire, the severity of the offenses charged, and the size of the area from which the venire is drawn. *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

Not only has Bradley failed to establish any particular difficulty in selecting a fair and impartial jury, he has not shown the existence of pervasive misleading pretrial publicity. Although he submitted numerous newspaper articles, only five of those he presented appeared in the various area papers during the 4-month period prior to the beginning of the jury selection, and these articles were factual in nature. No evidence of the nature or extent of any television or radio broadcasts was submitted. Under these circumstances, it cannot be said the district court abused its discretion by denying Bradley's motion. After all, the law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. *State v. Boppre, supra*; *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).

## 6. JURY SELECTION AND MANAGEMENT

In the sixth summarized assignment of error, Bradley attacks the district court's rulings concerning the seating and management of the jury. Specifically, he asserts the district court erred in (a) permitting the State to "death qualify" the jury, (b) refusing to permit venirepersons to be questioned separately, (c) refusing to excuse one venireperson for cause, and (d) refusing to sequester the jury during trial.

### (a) Death Qualification

Bradley first proclaims that the State should have been required to show that it intended to seek the death penalty and to list the aggravating circumstances supporting its death penalty request as a prerequisite to "death qualifying" the jury. This contention ignores the fact that the determination of a proper sentence is a judicial, not a prosecutorial, function. Neb. Rev. Stat. §§ 29-2520 et seq. (Reissue 1989). Taken to its

logical end, under Bradley's theory, in any first degree murder case in which the State seeks a death-qualified jury, the appropriate punishment would have to be determined before the guilt or innocence of the accused could be judged.

Bradley was potentially subject to the death penalty. Neb. Rev. Stat. § 28-105 (Reissue 1985) and § 28-303. While it was up to the court to determine the appropriate sentence in the event of a finding of guilt, the State, like Bradley, was entitled to a jury which would be impartial regardless of the potential punishment to be imposed. It is entirely permissible to exclude from jury service venirepersons whose views on capital punishment are such as to prevent or substantially impair their ability to impartially apply the law to the evidence. *State v. Boppre, supra*; *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989); Neb. Rev. Stat. § 29-2006(3) (Reissue 1989) (which provides that it is good cause to challenge one called for jury service in a capital case if his or her opinions are such as to prevent "finding the accused guilty"). See, also, *Silagy v. Peters*, 905 F.2d 986 (7th Cir. 1990).

### (b) Questioning of Venirepersons

Bradley also quarrels with the fact that the district court refused to permit him to question each venireperson separately from the others. He claims that, as a result, he was not able to ask the "searching questions" required in the circumstances. However, the record of the voir dire examination is replete with questions regarding pretrial publicity and whether such publicity had caused anyone to form an opinion as to Bradley's guilt or innocence.

Except when there is a showing that without sequestration a party's rights would be prejudiced, a party has no right to examine a venireperson out of the presence of all other venirepersons. *State v. Peery*, 223 Neb. 556, 391 N.W.2d 566 (1986). See, also, *State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985); *State v. Fiegl*, 184 Neb. 704, 171 N.W.2d 643 (1969). Bradley does not show what would have been different about his voir dire examination had he been able to question each venireperson individually, nor does he demonstrate that a biased jury was in fact selected. Accordingly, he has failed to

establish any prejudice by virtue of the court's ruling in this regard.

### (c) Nonremoval of Venireperson

Bradley next challenges the district court's failure to excuse a particular venireperson from jury service for cause. The venireperson in question stated that if the trial were to last 3 weeks, his mind might wander at times, and in that event he would accept the recollection of other jurors for anything he might have failed to hear. He also stated that if the evidence were 90 percent one way but for a technicality, he would tend to ignore the technicality. Bradley claims these responses established that the subject venireperson was unfit for jury service because he could neither listen to the evidence nor apply the court's instructions and thus should have been excused for cause. He argues that the district court's failure to do so forced him to use a peremptory challenge he should not have been obligated to exercise against the subject venireperson.

*Ross v. Oklahoma*, 487 U.S. 81, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988), makes it clear that as long as a state's statutorily mandated number of peremptory challenges is granted, the federal Constitution's requirement of due process of law is met. The effect of *Ross* is to leave to each state the question of whether the wrongful denial of a challenge for cause violates due process because a peremptory challenge must then be used to eliminate that venireperson. In any event, there can be no question as to whether a challenge for cause has been wrongfully denied if the denial was not erroneous.

The law of this state is that the retention or rejection of a venireperson as a juror is a matter of discretion with the trial court. *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Rice*, 231 Neb. 202, 435 N.W.2d 889 (1989); *Auer v. Burlington Northern RR. Co.*, 229 Neb. 504, 428 N.W.2d 152 (1988); *State v. Coffman*, 227 Neb. 149, 416 N.W.2d 243 (1987).

In addition to the expressions recited above, the venireperson in question stated that Bradley was "innocent right now" and that he really could not determine how he would react to the evidence until actually confronted with the need to do so. In actuality, the subject venireperson did nothing more than

acknowledge the human inability to be 100 percent attentive during an entire 3-week period and that he could not predict how he would evaluate the evidence until the moment of decision came. Under those circumstances, the district court did not abuse its discretion in refusing to remove the subject venireperson for cause.

### (d) Nonsequestration of Jury

In regard to this sixth summarized assignment of error, Bradley lastly contends the district court erred in failing to sequester the jury during the trial. The applicable rule is that whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court. *State v. Ell,* 196 Neb. 800, 246 N.W.2d 594 (1976). See, also, *State v. Bautista,* 193 Neb. 476, 227 N.W.2d 835 (1975); *State v. Kirby,* 185 Neb. 240, 175 N.W.2d 87 (1970). To warrant reversal, a denial of a motion to sequester the jury before submission must be shown to have prejudiced the defendant. *State v. Ell, supra; State v. Kirby, supra.* However, after the cause is finally submitted, unless sequestration is waived by the defendant, jurors must be kept together under the charge of an officer until they agree to a verdict or are discharged. Neb. Rev. Stat. § 29-2022 (Reissue 1989).

Bradley argues only that sequestration would have emphasized to the jurors the importance of impartiality. Such a statement does not, in and of itself, demonstrate that Bradley was prejudiced by the district court's failure to sequester the jury.

### 7. ENDORSEMENT OF WITNESSES

The seventh summarized assignment of error rests on the premise that the district court erred in permitting the late endorsement of additional State's witnesses and in refusing to grant Bradley a continuance as a result thereof and as a consequence of the State's failure to disclose evidence in compliance with the court's discovery order. Bradley specifically objects to the late endorsement of the victim's father, Robert Glasgow, as a witness for the State.

While the motion to endorse additional witnesses, which included the name of Robert Glasgow, was not filed until the

date on which jury selection began, the record indicates that the
State had previously informed Bradley's attorneys that it
planned to call Robert Glasgow to testify at trial. Furthermore,
such witness' testimony is primarily duplicative of testimony
provided by other witnesses and contains nothing which could
have in any way surprised Bradley or his attorneys.
Nevertheless, in an effort to show that he was somehow
prejudiced by Robert Glasgow's testimony, Bradley asserts that
the witness should not have been allowed at trial to identify a
picture of the victim with his two young children. Suffice it to
say that the picture which Robert Glasgow identified could not
have been prejudicial in light of the subsequent introduction of
evidence that the victim was married and had two young
children. Nor did the timing of the endorsement of Robert
Glasgow as a State's witness materially affect the proceedings in
the district court.

Likewise, the late endorsement of other witnesses, most of
whom were not called at trial, had no demonstrated material
effect upon Bradley's trial.

## 8. TRIAL RECORD

Bradley complains of the district court's failure to require the
court reporter to record all trial-related proceedings. The
foundation for this eighth summarized assignment of error was
laid by Bradley's pretrial motion that all proceedings in the
district court be reported, including arguments of counsel,
statements of the court, and discussions in chambers.

Neb. Ct. R. of Official Ct. Rptrs. 4 (rev. 1989) provides that
the reporter shall make a verbatim record of enumerated
proceedings and, at the request of any party or the court, of
certain other matters, including arguments· on motions and
objections and the rulings of the court thereon. *Kennedy v.
Kennedy*, 221 Neb. 724, 380 N.W.2d 300 (1986), makes clear
that a trial court has a duty to provide a party with a verbatim
trial record which comports to the requirements of the
foregoing rule and that such record shall, at a party's request,
include any comments the trial judge may have made. Indeed,
the failure of a trial judge to keep a proper verbatim record may
constitute grounds for judicial discipline, *Matter of Cieminski,*

270 N.W.2d 321 (N.D. 1978), and the failure of a court reporter to fulfill the duties of that office may make the reporter civilly liable to a litigant damaged thereby, *Grant v. Fletcher*, 564 S.W.2d 944 (Mo. App. 1978).

In this case the district court initially stated it would require all proceedings to be recorded in accordance with Bradley's request. However, it later refused to allow the reporting of bench conferences, stating that objections should be made in open court so that they could be reported.

Bradley asserts that had the district court allowed the record he requested, he, on preparing for appellate review, might have been alerted to the existence of errors which occurred at bench conferences or during other off-the-record discussions. However, after the district court's second ruling, it was incumbent upon Bradley to make all objections in open court and to object to any off-the-record discussions.

While it is true that a party is entitled to have reported any comments made by a trial judge, *Kennedy v. Kennedy, supra*, it is, in the final analysis, in the absence of any prejudicial comment's being made in the presence of the jury, the correctness and effect of any questioned ruling which controls the disposition of an appeal. See *Holt County Co-op Assn. v. Corkle's, Inc.*, 214 Neb. 762, 336 N.W.2d 312 (1983) (stating that a right result reached for the wrong reason will be affirmed). Here, there is no claim the trial judge made any prejudicial comment in the presence of the jury, and the record is otherwise adequate to address the effect of the rulings Bradley questions. Thus, he has shown no prejudice by the district court's failure to provide him with the record he requested.

In the absence of a showing of prejudice, an omission from a bill of exceptions does not vitiate a defendant's conviction. See *Phipps v. State*, 4 Tenn. Crim. App. 511, 474 S.W.2d 154 (1971).

## 9. ADMISSION OF EVIDENCE

In connection with the ninth summarized assignment of error, Bradley urges that the district court (a) erred in failing to suppress certain evidence, (b) erred in receiving a certain

weapon in evidence, and (c) erred in permitting him to be cross-examined in certain respects, and (d) that if no one erroneous ruling prejudiced him, the combined effect of all such rulings did.

### (a) Nonsuppression

The background for the nonsuppression claim rests in the fact that while in the custody of the Nebraska Department of Correctional Services, awaiting trial as described in part III(3) above, Bradley resided at a community correctional center and worked at one of the department's divisions, the Cornhusker State Industries. While at the Cornhusker State Industries facility and while at the center, Bradley had ready access to a telephone and some freedom of movement, but he was not allowed to leave either of the premises without permission.

While Bradley was working at the Cornhusker State Industries facility on April 27, 1988, he was questioned by Lincoln Police Detective Elgin Kuhlman and by Nebraska State Patrol Investigator Jack Wyant. Bradley was again questioned by Wyant and Kuhlman on May 17, 1988. Neither Wyant nor Kuhlman issued a *Miranda* warning before either of those interviews.

On June 26, 1988, Stacy telephoned Bradley at the center and on June 27 telephoned him at Cornhusker State Industries. While these telephone conversations between Bradley and Stacy were recorded by police, it was Stacy's idea to telephone Bradley. Stacy initiated the calls, as Bradley had previously requested that Stacy call him, and Bradley had given Stacy the telephone numbers Stacy used.

Before trial, Bradley filed a motion to suppress any information which the authorities had obtained as a result of their April 27 and May 17, 1988, meetings with Bradley on the ground that Bradley was not advised of his rights under *Miranda* prior to being questioned. Bradley also sought to suppress the tape-recorded conversations with Stacy. After initially overruling the motion, the district court reversed itself in part on the second day of jury selection and suppressed information stemming from the authorities' April 27 and May 17 questioning of Bradley.

Bradley argues that the district court erred in failing to suppress the taped telephone conversations between him and Stacy. In presenting this argument Bradley contends that the taped telephone conversations should have been suppressed because he was in custody when Stacy called him and because Stacy was acting as an agent of the police when he called. Bradley relies upon *Mathis v. United States*, 391 U.S. 1, 88 S. Ct. 1503, 20 L. Ed. 2d 381 (1968), and *State v. Fuller*, 204 Neb. 196, 281 N.W.2d 749 (1979), in presenting his argument. However, as stated in *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988), *cert. denied* 488 U.S. 865, 109 S. Ct. 168, 102 L. Ed. 2d 138:

> "*Miranda* warnings are required for official interrogations only where 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir.1985) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)). While *Miranda* may apply to one who is in custody for an offense unrelated to the interrogation, *see Mathis v. United States*, 391 U.S. 1, 4-5, 88 S.Ct. 1503, 1504-05, 20 L.Ed.2d 381 (1968), incarceration does not *ipso facto* render an interrogation custodial, *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978), *cited in Flittie v. Solem*, 775 F.2d 933, 944 (8th Cir.1985) (en banc). In all cases, we must consider the totality of the circumstances, including the individual's "freedom to leave the scene and the purpose, place and length" of the questioning. *Helmel*, 769 F.2d at 1320. . . . When an individual is incarcerated for an unrelated offense, this requires some restriction on his freedom of action in connection with the interrogation itself. *See Cervantes*, 589 F.2d at 427-28.

On June 26, 1988, Stacy telephoned Bradley at the center where Bradley was held in custody. On June 27, Stacy telephoned Bradley where he worked under the supervision of the Department of Correctional Services. It was common for Bradley to engage in telephone conversations at these locations. Under the circumstances, Bradley could not have felt compelled to speak with Stacy on the telephone, and he could

have discontinued the conversation at any time. Thus, based upon *Leviston*, the authorities were not required to "mirandize" Bradley in order to render those taped telephone conversations admissible.

Furthermore, the circumstances surrounding the taped telephone conversations fall squarely within the rule recently announced in *Illinois v. Perkins*, ____ U.S. ____, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990), a case in which the U.S. Supreme Court, reasoning that the situation was not inherently coercive, held that an undercover police officer posing as a fellow inmate was not required to provide *Miranda* warnings to an incarcerated suspect before asking questions intended to elicit an incriminating response. Thus, the tapes of the June 26 and 27, 1988, telephone conversations between Bradley and Stacy were properly admitted by the district court.

Bradley also argues that Stacy's in-court testimony and the tapes of the telephone conversations between him and Stacy were the fruits of the improper (for failure to give *Miranda* warnings) April 27, 1988, interrogation, asserting that the authorities would not have interviewed Stacy in the absence of information they received while interrogating Bradley on April 27. Bradley thus contends that the district court erred in failing to suppress that evidence and in admitting that evidence over his objections at trial.

Kuhlman testified at trial that Bradley had given Stacy's name to him and to Wyant. At the suppression hearing Kuhlman had also testified that he had done no research concerning Bradley's background prior to questioning him. Bradley asserts that this testimony shows that the authorities questioned Stacy as the direct result of their improper interrogation of himself, that Stacy's testimony and the taped telephone conversations between him and Stacy thereby represented "fruit" of the improper interrogation, and that such evidence therefore should have been suppressed.

At trial, however, after reviewing State Patrol reports, Kuhlman recalled that prior to the time he and Wyant questioned Bradley, authorities had learned that Stacy was Bradley's partner in a gun dealership and that Bradley had been attempting to contact Stacy. Consequently, the district court

ruled that authorities would have inevitably contacted Stacy and, therefore, that neither Stacy's testimony nor the taped telephone conversations were "fruits" of the improper interrogation of Bradley. See *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989).

While the "inevitable discovery" doctrine is dispositive of this issue, Bradley further argues that the district court abused its discretion by not allowing a continuance or other opportunity for him to investigate the accuracy of Kuhlman's "changed" testimony.

There is no abuse of discretion by the district court in denying a request for a continuance unless it clearly appears that the movant suffered prejudice as a result of that denial. *State v. Perez*, 235 Neb. 796, 457 N.W.2d 448 (1990). Here, Bradley provides us with no indication, either by testimony at his motion for new trial or otherwise, of what would have been revealed by further investigation of Kuhlman's trial testimony, and does not show that he was in any way prejudiced by the district court's refusal to grant him a continuance.

### (b) Receipt of Weapon

Bradley also argues the State failed to lay sufficient foundation for admittance in evidence of the gun as the murder weapon. But as noted in part II, Stacy identified the gun at trial and testified that he was told by Bradley that Bradley had used a like Smith & Wesson revolver to kill the victim and that, as requested by Bradley, Stacy retrieved the subject gun from a house where Bradley had previously lived and gave it to Bradley's brother.

Bradley asserts that questions concerning the chain of custody of the gun from the time Stacy retrieved it until trial, along with the State's ballistics expert's inability to positively identify the gun as the murder weapon, should have precluded the introduction of the gun as evidence at trial. However, given Stacy's testimony, Bradley's assertion goes merely to the weight to be given to the evidence presented rather than to the admissibility of that evidence.

### (c) Cross-examination

Bradley's complaints in regard to his cross-examination

relate to two areas, (i) information stemming from the suppressed April 27, 1988, interview and (ii) certain letters he had written.

### (i) Suppressed Interview

When the State cross-examined Bradley after he had testified on his own behalf, the prosecutor asked him whether he had been to the victim's apartment between midnight and 3 a.m. on one occasion in July 1987. It does appear that information received directly from the suppressed April 27, 1988, interrogation of Bradley was the basis of the question, for at an earlier hearing on the motion to suppress that conversation, Kuhlman testified that it was during that interview that Bradley informed him that he had gone to the victim's apartment between midnight and 3 a.m. on one occasion.

The district court found that reference to the April 27, 1988, conversation was allowable on cross-examination as a result of responses Bradley made on direct examination. However, in reviewing the testimony which Bradley provided on direct examination, we find nothing to support such a ruling, nor does the State direct us to any part of the record which it claims supports the ruling.

It is true that an error in admitting or excluding evidence in a criminal trial, whether of constitutional magnitude or otherwise, is prejudicial unless it can be said that the error was harmless beyond a reasonable doubt. *State v. Rowland*, 234 Neb. 846, 452 N.W.2d 758 (1990); *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988); *State v. Watkins*, 227 Neb. 677, 419 N.W.2d 660 (1988). However, it is equally true, as noted previously in part III(2), that the improper admission of evidence constitutes harmless error where the evidence is cumulative and there is other competent evidence to support the conviction.

Bradley asserts that by improperly permitting the State to cross-examine him concerning the early morning visit to the victim's apartment, the district court enabled the State to argue that Bradley was "stalking" the victim and to thereby establish that the murder was premeditated. However, the effect of the court's apparent error could not have had as profound an effect

as Bradley asserts, for Stacy testified that Bradley had told him that he, Bradley, had "planned everything," that "everything went just like he planned," and that he killed the victim because the victim was "harassing" his estranged wife. Stacy's testimony provided more direct evidence of Bradley's premeditation than did the testimony that Bradley had previously visited the victim's apartment. Thus, the evidence to which Bradley objects was cumulative and harmless beyond a reasonable doubt.

### (ii) Letters

Bradley next alleges that the district court erred in allowing the State to attempt to impeach him by referring to and questioning him regarding certain letters he had written.

He first asserts that it was improper for the State to refer to these letters because the letters were not introduced into evidence at trial. Contrary to Bradley's argument, the letters to which the prosecutor referred did not have to be introduced into evidence, for Bradley admitted to having written them and testified as to their contents. See *State v. Johnson*, 220 Neb. 392, 370 N.W.2d 136 (1985).

Bradley also argues that it was improper for the prosecutor to ask him whether the letters were written in an effort to create an alibi which would clear him of the victim's murder. However, in its case in chief the State presented evidence that Bradley had attempted to fabricate an alibi which would prevent his conviction. On direct examination by his attorneys, Bradley provided testimony to rebut the evidence that he had attempted to fabricate an alibi. Consequently, the cross-examination in question constituted proper and relevant impeachment.

### (d) Combined Effect of Rulings

Bradley also argues that even if no one of the allegedly erroneous rulings discussed in this opinion entitles him to a reversal of his conviction, the combined effect of all of them certainly does. The difficulty is that just as he fails to document the assertedly prejudicial effect of any one ruling, he fails to demonstrate the allegedly prejudicial effect of any designated combination of rulings.

## 10. SUFFICIENCY OF THE EVIDENCE

Bradley avers his convictions are not supported by the evidence and that the district court thus erred in failing to grant his motions for acquittal made at the close of the State's case in chief and at the close of all the evidence.

The controlling rules are that in reviewing a criminal case for alleged insufficiency of the evidence, the State is entitled to have all relevant evidence favorable to the State treated as true, as well as to have every beneficial inference reasonably deducible from that evidence. *State v. Williamson*, 235 Neb. 960, 458 N.W.2d 236 (1990). Moreover, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, whose findings must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support them. *State v. Cortes, ante* p. 257, 460 N.W.2d 659 (1990); *State v. Grantzinger,* 235 Neb. 974, 458 N.W.2d 461 (1990); *State v. Broussard,* 235 Neb. 809, 457 N.W.2d 457 (1990). On a claim of insufficiency of the evidence, the Supreme Court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may the Supreme Court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Cortes, supra; State v. Grantzinger, supra; State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990). In a criminal case a trial court can direct a verdict only when (1) there is a complete failure of evidence to establish an essential element of the crime charged, or (2) the evidence is so doubtful in character and lacking in probative value that a finding of guilt based on such evidence cannot be sustained. *State v. Brown*, 235 Neb. 374, 455 N.W.2d 547 (1990); *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989).

One commits first degree murder if he or she, among other things, "purposely and with deliberate and premeditated malice" kills another person. § 28-303(1). Anyone who, among other things, uses a firearm "to commit any felony which may be prosecuted in a court of this state . . . commits the offense of

using firearms to commit a felony." § 28-1205(1).

By the time the State had completed its case in chief, it had adduced sufficient evidence to support a finding that Bradley did deliberately and with premeditated malice purposely shoot and kill the victim in Saline County in order to relieve the victim's estranged wife of the stresses of her pending dissolution action. The State had thus established a prima facie case of first degree murder against Bradley. Inasmuch as first degree murder is a felony prosecutable in the courts of this state, § 28-303, the State had also established a prima facie case that Bradley had used a firearm to commit that felony. It necessarily follows, then, that the district court did not err in overruling the motions for acquittal.

## 11. CONDUCT OF PROSECUTOR

Finally, in this 11th and last summarized assignment of error, Bradley argues that if all else fails, he is entitled to a reversal of his convictions because of the prosecutor's misconduct. Bradley first contends that he was denied a fair trial because the State did not comply with the district court's discovery order in that it "was slow to provide some investigative reports and did not provide some others," "endorsed several witnesses at the last minute," and failed to disclose prior to trial the photograph of the victim with his children, which photograph was identified by Robert Glasgow. Brief for appellant at 48.

We have analyzed the late endorsement of witnesses and Robert Glasgow's identification of the photograph of the victim and his children in part III(7) above and need not repeat that discussion here. Regarding reports which allegedly were not produced or were not produced in a timely manner, Bradley provides no indication of the nature or contents of these missing or late reports, and he thereby fails to show how he was prejudiced by the prosecutor's alleged misconduct.

Bradley also alleges that the prosecutor improperly took the "deposition" of the victim's wife without giving notice to defense counsel. Contrary to Bradley's assertion, the record shows that the State merely took a sworn statement from her. The State had no duty to notify Bradley that it planned to take her statement, and did not act improperly in doing so.

Bradley further contends that the State's attorney "argued his case" and made improper remarks during voir dire and during opening arguments. While Bradley generally claims that such alleged misconduct denied him his right to due process and a fair trial, he does not demonstrate that he was in fact prejudiced by the alleged misconduct.

In *State v. Wounded Arrow*, 207 Neb. 544, 548, 300 N.W.2d 19, 22 (1980), this court stated: "Before it is necessary to grant a mistrial due to prosecutorial misconduct, the defendant must show that a 'substantial miscarriage of justice has actually occurred.' " See, also, *State v. Ross,* 220 Neb. 843, 374 N.W.2d 228 (1985). Furthermore, remarks made by the prosecutor during final argument which do not mislead or unduly influence the jury do not rise to the level sufficient to require granting a mistrial. *State v. Boppre, supra*. Similar standards are applicable where one seeks a new trial by raising on appeal the issue of prosecutorial misconduct. As noted previously in part III(2), if there is some incorrect conduct in a jury trial which, on review of the entire record, did not materially influence the jury in its verdict adverse to a substantial right of the defendant, the error is harmless.

Although Bradley cites us to a number of instances where he believes the prosecutor's statements during voir dire were improper, our review of the record reveals that these statements could not have had a material influence upon the jury. Nor could the jury have been materially influenced by allegedly improper statements made by the State's attorney during opening arguments.

Bradley next asserts that the prosecutor improperly referred to letters not introduced into evidence which the State had used to impeach him, that the prosecutor made representations of fact which were not consistent with the evidence presented at trial, and that the prosecutor expressed his personal belief that Bradley was guilty. The matter of the letters was addressed earlier in part III(9)(c)(ii) and need not be discussed again. As to the purported misrepresentations of fact, one relates to the testimony of the victim's wife, and the other relates to the testimony of the pathologist.

With respect to the victim's wife, the prosecutor in his

opening statement represented that she once claimed to never having been alone with Bradley. Bradley argues that having taken her sworn statement, the prosecutor had to know the fact was otherwise, and the comment was made only to disparage the victim's wife, whose testimony was generally favorable to Bradley. The difficulty is that Bradley fails to show that the victim's wife had never claimed she had not been alone with him. If she once made such a claim, the prosecutor could not know what version she might recite at trial, no matter what she said during her sworn statement. As we have said, one is allowed considerable latitude in making an opening statement, and the mere fact that one fails to prove all that one expected does not mean a statement was intentionally false. *Yechout v. Tesnohlidek*, 97 Neb. 387, 150 N.W. 199 (1914). See, also, *Russell v. State*, 62 Neb. 512, 87 N.W. 344 (1901).

Bradley also claims that in the prosecutor's closing argument, he misrepresented the pathologist's testimony. According to Bradley, the cause of death was a critical question in this case because if the victim was "struck in the head and killed outside of Saline County and his body deposited there," the State would have failed to prove venue. Brief for appellant at 54-55. The prosecutor stated the pathologist testified at trial that blunt trauma could have caused death only if the trauma had produced brain damage. The prosecutor then claimed there was no evidence of any such damage. A review of the pathologist's testimony reveals that he found a facial fracture in addition to bullet wounds, and testified that the fracture and wounds could have occurred as much as 12 hours apart. He further testified that if the facial fracture caused the death, it would likely not be from loss of blood, as Bradley suggested, but from injury to the brain. Thus, the prosecutor did not misstate the pathologist's testimony. Since, as Bradley himself concedes, there was no brain as such to examine, there could have been no physical evidence of brain injury. Neither was there any testimony based on reasonable medical certainty, or otherwise, that the facial fracture did in fact cause any brain injury.

Nor is Bradley any more accurate in characterizing the prosecutor's comments as to the issue of guilt during his

opening statement. The prosecutor did not state he himself believed Bradley to be guilty, as Bradley claims; rather, the prosecutor said the evidence would show that Bradley had killed the victim. See *State v. Wounded Arrow*, 207 Neb. 544, 300 N.W.2d 19 (1980).

## IV. DECISION

Since, as stated in part I, none of the summarized assignments of error argued in Bradley's briefs have merit, the judgment of the district court is affirmed.

AFFIRMED.