IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. BURHAN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

OMAR S. BURHAN, APPELLANT.


Filed September 13, 2016.    No. A-15-572.


Appeal from the District Court for Douglas County: JOSEPH S. TROIA, Judge. Affirmed.

Peder Bartling, of Bartling Law Offices, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.


INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial, Omar S. Burhan was convicted of robbery, possession of a firearm by a prohibited person, second degree assault, and two counts of use of a deadly weapon (firearm) to commit a felony. Burhan appeals, claiming that he should have been granted a mistrial due to improper remarks made by the prosecutor during voir dire. He challenges his convictions and sentences on a number of grounds, and he claims that his trial counsel was ineffective. For the following reasons, we affirm.

## II. BACKGROUND

On August 5, 2014, Elizabeth Albrecht sustained three gunshot wounds. She told police that a man she knew as "Charles" or "T" had shot her and driven away in her car, a white Nissan Altima with South Dakota license plates (she was also able to provide the officers with the license

plate number). A police broadcast was issued regarding the description of the vehicle. An officer subsequently located Albrecht's vehicle, and Burhan was standing next to it. Burhan was arrested.

Burhan was ultimately charged with the following: Count 1, robbery, a Class II felony, pursuant to Neb. Rev. Stat. § 28-324 (Reissue 2008); Count 2, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, pursuant to Neb. Rev. Stat. § 28-1205 (Cum. Supp. 2014); Count 3, possession of a firearm by a prohibited person, a Class ID felony, pursuant to Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2014); Count 4, second degree assault, a Class III felony, pursuant to Neb. Rev. Stat. § 28-309 (Cum. Supp. 2014); and Count 5, use of a deadly weapon (firearm) to commit a felony, a Class IC felony, pursuant to § 28-1205.

At trial, the State called several witnesses and introduced numerous exhibits into evidence. Burhan did not testify. The parties stipulated that Burhan was a "prohibited person" as defined by statute.

Albrecht testified as follows. She was 36 years old, and lived in Sioux Falls, South Dakota. Although she had a job in a restaurant, her primary source of income was derived from gambling at various casinos. Albrecht sometimes loaned money to fellow gamblers, and some of them gave her their personal property (mostly electronics) as collateral; if they did not repay their loan, Albrecht would pawn or sell the items in order to recoup some of her money. In the past, Albrecht relied on friends to help her sell the electronics. One of those friends was J.D., a man she met through her former fiancé. J.D., who knew Burhan, told Albrecht that Burhan might be able to help her sell some of her electronics. In the 2 to 3 months after J.D. introduced Albrecht to Burhan (known to her as "T"), she had three to four face-to-face contacts with Burhan in Omaha, Nebraska, and Council Bluffs, Iowa (although none of those contacts involved the sale or discussion of electronics).

Albrecht testified that on August 5, 2014, she was driving to visit her boyfriend in Kansas City, Missouri, from her home in Sioux Falls. In her car was a duffle bag (containing clothes, shoes, and a laptop), electronics, and a GPS. As part of her trip, Albrecht planned to stop at a few casinos to gamble. She gambled at a casino in Sioux Falls, and later at a casino in Sioux City, Iowa. Prior to leaving Sioux City, Albrecht separated her money, placing some cash inside her purse and the rest of her money (which she said was "in the thousands") inside the sunglasses holder located above the rear-view mirror in her Nissan. She then called Burhan to let him know she would be in the Omaha area. After leaving Sioux City, Albrecht drove to a casino in Council Bluffs, gambled a while, and won some more money. She asked Burhan to meet her at a different casino in Council Bluffs, but he asked her to meet him in Omaha instead; she agreed and he gave her directions to a gas station.

Albrecht arrived at the gas station at 6:28 p.m. (per the store's surveillance video received into evidence). She filled her car up with gas and bought some snacks (beef jerky and an energy drink) while she waited for Burhan. Because he had not arrived, Albrecht called Burhan who said he was ten blocks away. Albrecht testified that Burhan arrived on foot a few minutes later, opened the passenger side door, and after extinguishing his cigarette, he got into the vehicle; she said he was wearing a gray short-sleeved T-shirt and jeans. Burhan told Albrecht that he needed to stop at his house and directed her to a nearby residential neighborhood. (The surveillance video showed that at about 6:40 p.m., a man wearing pants, a long-sleeved shirt, and white shoes walked across

the parking lot towards the white vehicle and he appeared to put a cigarette out before entering the vehicle; the vehicle then drove away from the gas station.)

Albrecht testified that while driving with Burhan they talked about her trip, her casino winnings, and the electronics she had in the car. When they arrived at their destination, Burhan told Albrecht to pull over and park on the side of the road. Albrecht was on the phone with her boyfriend and noticed that Burhan was not exiting the vehicle. When she asked why he was not going inside to get what he needed, Burhan said he could not get in the house and either his brother or cousin had gone to the store and would be back shortly with the keys. At that point Albrecht became suspicious that Burhan could not get into his own house. After her boyfriend called her again, she told Burhan he needed to get out of the vehicle because she needed to be on her way.

Albrecht testified that without warning, Burhan punched her in the face three times. Burhan "used profanity and told [Albrecht] that he was taking [her] purse," which was between Albrecht and the driver's side door. Albrecht refused to give Burhan her purse and the two of them were struggling over it when Burhan pulled out a gun. At that point Albrecht let go of her purse. Burhan demanded that she get out of the vehicle; she told Burhan he could take her money but to give her her driver's license (she testified that she had been robbed and burglarized 10 to 12 times before and that it could be a drawn-out process to get a new ID). Albrecht decided that if Burhan was going to take her money, purse, and car, she at least needed to have her cell phone to call for help because she would be stranded. She reached for her cell phone (which was plugged in) and grabbed for the handle of the door so she could get out; Burhan fired the first shot, which grazed her right thigh. Albrecht was still trying to get out of the vehicle when Burhan fired the second shot, which went in and out of her left calf. She was halfway out of the car when Burhan grabbed her right arm, pulled it back inside the vehicle, put the gun up to her right wrist, and fired a third shot. Albrecht was able to get out of the vehicle and run toward children playing in the street; they directed her to some adults whom she asked to call 911.

Albrecht testified that the third bullet hit a major artery and her wrist was "spraying blood"; she was also feeling light headed and dizzy. The police arrived and asked her questions and then an ambulance took her to the hospital where she immediately went into surgery.

Angel Sanchez, who was 12 years old at the time of trial, testified that he was playing outside on August 5, 2014, when he saw a woman open the door to a white Nissan; she yelled for help and Sanchez heard gunshots (he thought they were fireworks at the time). After the woman got out of the car, another person closed the car door and drove away. The person who closed the car door was black (Sanchez saw a hand); and while Sanchez did not see the person's face, he did see that the person was wearing a gray jacket. The woman ran towards Sanchez, who directed her to some adult neighbors.

Matthew Austin, an officer with the Omaha Police Department (OPD), testified that he responded to a shooting in the area of 38th and Grover, and was the first officer on the scene when he arrived at 7:05 p.m. Upon arrival, he contacted Albrecht, who had three gunshot wounds. She identified the suspect as "T," a black male, and said "T" had left in her car; she described the car as a white Nissan Altima with South Dakota plates (and she was able to give the plate number). Within minutes, Officer Austin put a broadcast out on the police radio.

Christian Mirch, an officer with the OPD, testified that on August 5, 2014, at 8:05 p.m., he heard a radio broadcast regarding a robbery and felony assault; the broadcast stated that the suspect may be in a white Nissan Altima with South Dakota plates. When he received the broadcast, Officer Mirch was between 60th and 58th Streets on Northwest Radial. He happened upon the white Nissan at approximately 49th Avenue and Northwest Radial. The vehicle was backed into one of the garage stalls at a self-serve carwash. A man, later identified as Burhan, was standing between the open driver's door and the vehicle; no other individuals were near the vehicle. When Burhan saw Officer Mirch, he immediately proceeded to the back of the vehicle and "ducked down" behind the trunk. Officer Mirch exited his cruiser and called for Burhan to come out. Burhan walked to the passenger side of the vehicle; he was holding a black garbage bag in his right hand. Burhan was ordered to drop the bag and get down on the ground. When backup arrived, Burhan was handcuffed, given a brief pat-down (no weapon was found), and put in the police cruiser. A radio call confirmed the white Nissan was the same one stolen in the robbery. Burhan was taken to OPD Central Headquarters. At the time of his arrest, Burhan was wearing jeans and a blue T-shirt.

Danette Culler, a sergeant with the OPD, testified that on August 5, 2014, she was a detective with the OPD. Burhan was brought into police headquarters between 8:30 and 9 p.m., at which time she interviewed him. A video recording of the interview was received into evidence as Exhibit 1 and published to the jury.

The video recording of the police interview, Exhibit 1, reveals the following. Burhan was swabbed for DNA and gunshot residue (GSR) before being questioned by Detective Culler. During his interview with Detective Culler, Burhan was evasive throughout. He gave two fictitious addresses for his home address, and denied knowing the full names of the friends with whom he allegedly spent the day. Burhan denied involvement in the shooting. He stated that he was walking by the carwash on his way to visit a friend when a man roughly his size flagged him down and offered to sell him some items. Burhan said that after trying on a gray button-up shirt, pants, and shoes, he agreed to buy those items and a GPS for $20. According to Burhan, the man put the items in a bag and handed it to him saying "I'll be right back"; the man then walked off with another bag before the police arrived.

Krystal Kirwan, a crime lab technician for OPD, testified that she went through the black garbage bag that Burhan had in his possession at the carwash and itemized the contents. Among the items found in the bag were: a long-sleeved gray shirt with "apparent" blood; a gray T-shirt; jeans with "apparent" blood; a pair of shoes (white with black trim) with "possible" blood; a GPS; a Verizon charger; beef and cheese wrapper; an energy drink; a towel; a pair of gloves; and sunglasses.

An OPD detective testified that she recovered Burhan's property bag from Douglas County Corrections; among the items in his property bag collected at the time of booking were a partially smoked cigarette and $1,012 cash.

Rachel Larson, an employee with the OPD crime lab, testified that when Albrecht's car was processed at the impound lot, it was swabbed for DNA and processed for fingerprints; but Larson was not able to obtain fingerprints from the car. Larson testified that there was "apparent" blood on the interior of the driver's door, the floor board by the driver's seat, and on the driver's

seat. A spent projectile was found by the driver's side floor mat, possibly from "a 38, 357 or a 9-millimeter."

Frederic James, from the OPD assault squad, testified that he conducted a search of Albrecht's vehicle pursuant to a search warrant. He found a large sum of cash in the sunglasses holder of the vehicle. James testified that no DNA or GSR tests were ordered in this case, partially because of cost and because he did not feel such tests were necessary; he did not elaborate any further.

Several other law enforcement officers testified that they helped to canvas the areas of the shooting and the carwash. Nothing of evidentiary value was found at or near the carwash. At the scene of the shooting, two .380 caliber shell casings were found in the street.

Albrecht's purse, duffel bag, and electronics were never found. No gun was ever found.

The jury found Burhan guilty of all five counts, and the court entered judgment based on the jury's verdicts. The court thereafter sentenced Burhan to imprisonment for 10 to 15 years for robbery (Count 1), 10 to 10 years for possession of a firearm by a prohibited person (Count 3), 20 to 20 years for second degree assault (Count 4), and 5 to 10 years for each use of a deadly weapon (firearm) to commit a felony (Counts 2 and 5); the court ordered the sentences in Counts 1, 3, and 4 to be served concurrently with each other, the sentence in Count 2 was to be served consecutively to the sentence in Count 1, and the sentence in Count 5 was to be served consecutively to the sentence in Count 4. Burhan was given credit for 295 days' time served against the sentences imposed under Counts 1, 3, and 4.

Burhan appeals his convictions and sentences.

## III. ASSIGNMENTS OF ERROR

Reordered and restated, Burhan assigns: (1) the district court erred in overruling his motion for mistrial during jury selection; (2) the State presented insufficient evidence for the jury to convict him; (3) the district court imposed excessive sentences; (4) the district court erred in failing to award him credit for time served against Counts 2 and 4; (5) there was a violation of the cumulative error doctrine; and (6) he received ineffective assistance of counsel at trial.

## IV. STANDARD OF REVIEW

Decisions regarding motions for mistrial are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion. *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016).

An appellate court reviews criminal sentences for an abuse of discretion, which occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

The resolution of an ineffective assistance of counsel claim made on direct appeal turns on the sufficiency of the record. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

## V. ANALYSIS

### 1. MOTION FOR MISTRIAL

Burhan asserts that the district court erred in overruling his motion for mistrial when, during voir dire, the State improperly remarked on Burhan's right to remain silent and his presumption of innocence, and remarked erroneously on the appropriate definitions of burden of proof and reasonable doubt.

### (a) Challenged Statements

At the outset, we take note that voir dire "plays a critical function in assuring the criminal defendant that his constitutional right to an impartial jury will be honored." *State v. Iromuanya*, 282 Neb. 798, 816, 806 N.W.2d 404, 425 (2011). "'The principal purpose of voir dire examination is to ascertain whether the proposed juror is free from bias or prejudice, and whether he is in such attitude of mind with respect to the case in hand that he would be a fair and impartial juror.'" *State v. Shipps*, 265 Neb. 342, 349, 656 N.W.2d 622, 629-30 (2003) (quoting *Strong v. State*, 106 Neb. 339, 340, 183 N.W. 559, 559 (1921)).

Four exchanges that occurred during voir dire are challenged by Burhan, and we set them out at length below. The italicized portions are statements that Burhan identifies in his brief as particularly problematic.

### (i) First Exchange

The first exchange, which Burhan argues infringed on his constitutional right to remain silent, occurred during a discussion with a potential juror who was shot during a robbery in 2010.

> [Prosecutor]: That experience -- you're going to hear from a woman who also had items taken from her and who was shot during the process. So it's going to be sort of similar to maybe some of the things you've gone through.
>
> [Potential juror]: Yeah.
>
> [Prosecutor]: Obviously, there's a presumption of innocence that carries throughout the trial. He is absolutely innocent at this point in time. I've presented no evidence whatsoever. Would you agree with me that as of right now, having heard nothing other than what the charges are, that it's a robbery and an assault, someone was shot, that he's still presumed innocent?
>
> [Potential juror]: I mean, well, we don't really know his side of the story. So I would assume so, yes.
>
> [Prosecutor]: Okay. And then in the State of Nebraska, in the United States, you have a right not to testify, right?
>
> [Potential juror]: Uh-huh.

[Prosecutor]: And then that cannot be used against him either. Would you agree with me on that?

[Potential juror]: Yes.

[Prosecutor]: *But that's a natural human thing, like, I would like to know his response.*

[Potential juror]: Correct. I mean, but if you want to do it fairly, you would want to hear his side of the story.

[Prosecutor]: Sure. At this point in time, we don't really know what occurred.

[Potential juror]: Right.

[Prosecutor]: And what I want to know from you is that if the defendant does not testify, will you hold that against him? Will you think, well, why wouldn't he get up there and say his side of the story?

[Potential juror]: I mean, that should be your first reaction, like, why wouldn't he want to tell his side of the story if he's not guilty. That's what most people would think. But, I mean, you know, maybe he's like, no, I'm already guilty or I'm already caught in this. (Inaudible).

[Prosecutor]: In some countries, the state or the government can compel the person to have to testify in his case, so I could call him as a witness and force him to answer questions. But here in the United States, that's something that we -- that's not a system that we adopt. So would you be able to, understanding that framework, not hold maybe his silence against him?

[Potential juror]: I mean, I honestly don't know. I can't answer that.

[Prosecutor]: All right. You're going to get a set of jury instructions. And if it says you must not consider *the defendant's refusal to testify* in any way, shape or form with regard to his guilt or innocent [sic], will you follow that instruction?

[Potential juror]: Yeah.

[Prosecutor]: And that's all we can ask of anybody, *because naturally you're like, well, I want to hear both sides.* But in order for this system that we have to work, we have these built-in presumptions, built-in rules, this is how we're going to keep it fair, we're going to hold the State's feet to the fire through this whole thing, the State has to carry the water through the entire thing. The defendant doesn't have to ask a single question or call a single witness. For the most part, it's a pretty good system. It's a tough system because we have it [sic] to produce everything, and we have to overcome *that natural, I wish I knew what he would say*, because that's just naturally -- if you had two kids that were fighting, obviously, you're going to split them up, whatever, whatever. But in this system, we're just not able to do that.

Does anyone -- and this is kind of outside of what I was originally asking. But does anyone disagree with that type of judicial system that we have here in the United States?

(No audible response.)

Okay. . . . being the victim of a robbery, are you still comfortable sit [sic] as a juror in this case?

[Potential juror]: Oh yeah, I'm fine.

[Prosecutor]: And you'd be fair and impartial to both sides?

[Potential juror]: Uh-huh.

### (ii) Second Exchange

The second exchange, which Burhan argues also infringed on his constitutional right to remain silent, occurred during a discussion with the jury about circumstantial evidence.

[Prosecutor]: . . . [W]ould you be able to convict someone on circumstantial evidence alone? If it meant [sic] the State's burden, even though the State didn't call a single witness of what actually occurred but I could piece it all together, would you be able to do that?

[Potential juror]: If you don't have any witnesses?

[Prosecutor]: No witnesses.

[Potential juror]: Any proof?

[Prosecutor]: I have proof but no eyewitnesses.

[Potential juror]: Maybe, yeah. Maybe.

[Prosecutor]: Are you going to hold me to a higher standard because I don't have an eyewitness?

[Potential juror]: You are going to have be able to piece it together.

[Prosecutor]: Does anyone disagree. . .? "There is no way, Mr. [Prosecutor], if you don't have an eyewitness to the crime, that I'm never going to find anyone guilty" *Would you agree with me . . . the only person that knows what actually happened is the person that did it?*

UNIDENTIFIED VOICE:     True.

[Prosecutor]: Right. And *in this jurisdiction, I can't force that person to take the stand*, right?

[Potential juror]: That's what you said earlier.

[Prosecutor]: Yeah. *Sometimes it puts the State in a tough spot.*

. . . I want to remind all of you that the only thing you will get to decide is to [sic] whether or not this occurred and if it occurred in [sic] the hands of the defendant. You do not get to decide what the sentence is[.]

### (iii) Third Exchange

The third exchange, which Burhan argues infringed on his presumption of innocence, occurred during a discussion with another potential juror who was robbed, abducted, and assaulted in 1982; the perpetrator only got 3 years' imprisonment and after being released he raped a different woman and shot that woman's husband.

[Prosecutor]: My question is, are you going to try to use this as an opportunity to right the wrong that happened maybe back in the early eighties?

[Potential juror]: I don't know. I couldn't be fair to him.

[Prosecutor]: You could not be fair to him?

[Potential juror]: No.

[Prosecutor]: . . . the instructions will be, at this point in time, he is presumed innocent, would you agree with that?

[Potential juror]: No.

[Prosecutor]: Okay. Tell me why.

[Potential juror]: They arrested him for a reason.

[Prosecutor]: And even though someone's arrested and I charge them with the five crimes -- that was my decision -- the charges simply are just allegations at this point.

[Potential juror]: Right.

[Prosecutor]: And the rules are kind of strange in a way. What they ask you it [sic] do is to almost set aside what we all understand the world to be, that the officer obviously arrested him for a reason, the prosecutor charged him for a reason. And what we're basically telling you by this rule is, please disregard any of the experience that the officer or the judges or the prosecutors might have used and judge this with a clean slate. I think everything [sic] probably feels the exact same way, like, I've been called down here to jury service for a reason, it's gone this far, *there must be something that happened here*. But I guess the question really is to you, knowing all that, and being instructed by the judge that you have to set all that aside the best you can and judge the evidence for what is here today, are you willing to do that?

[Potential juror]: No, I'm not. I can't.

[Prosecutor]: Move to strike for cause.

[Defense]: No objection.

THE COURT: you may step down.

([Potential juror] excused from the jury panel.)

### *(iv) Fourth Exchange*

In the fourth exchange, Burhan contends that the prosecutor mischaracterized the State's burden of proof and incorrectly described reasonable doubt.

[Prosecutor]: Defendants are presumed not guilty. We spoke of that earlier. The State must produce all the evidence. And in this jurisdiction, the defense is entitled to review all police documents, have all the witnesses ahead of time. The defense may produce some evidence, they may not. Sort of went over that earlier this morning. They are under no burden to do so.

The burden of proof is something that's going to be stressed on during this entire trial.

. . . what is the burden of proof in a criminal case? Do you remember?

. . . .

[Prosecutor]: Everybody heard those terms, "beyond a reasonable doubt." What does that mean to you?

[Potential juror]: That in my mind -- I don't have any doubt?

. . . .

- 9 -

[Prosecutor]: Now, what the judge will instruct you and what the instruction will say is that I don't have to prove my case beyond any doubt. There is always this possibilities [sic], but it's a question as to whether or not it's reasonable. And so if you had to prove beyond any doubt, that would be 100 percent, right?

UNIDENTIFIED VOICE:     Right.

[Prosecutor]: But the law doesn't hold that State to that standard. The law requires me [sic] that it will always be my burden, but the law doesn't say I have to carry it to 100 percent.

Who thinks I should have to carry it to 100 percent? Does anyone think we shouldn't find anyone guilty of anything unless we're 100 percent absolutely sure? There is nothing wrong with feeling that way. Because for a lot of folks that's how they feel. If you had to assign a number to how far it had to prove someone guilty, would you be able to assign the number to "beyond a reasonable doubt"?

[Potential juror]: I would say over 50 percent.

. . . .

[Prosecutor]: In a civil case it would be 50 percent. In a criminal case they don't give us a number. What they ask us to do is use common sense and think is this a decision I would make without hesitation in my ordinarily [sic] walk of life. If the sign says walk, have you gotten enough information where you're comfortable walking? If the sign says walk on the crosswalk, sure there is always a possibility there is going to be some plane that's going to fall out of the sky, but is that reasonable? No. Use your common sense. I've got enough information, I've looked both ways, and the sign says walk, I'm going to walk. That's . . . the burden you have to hold us to. Not to all doubt, beyond all doubt, not 100 percent. We're not computers. There is not a number. It's not 80 percent. It's not 70 percent. It's not 99 percent. Just keep your brains [sic] with that option.

(b) Motion for Mistrial and Trial Court's Response

After the State passed the jury for cause, defense counsel stated she had a motion and suggested a brief recess. After recessing, the following colloquy took place outside the presence of the jury.

[Defense]: Your Honor, at this time I'm going to move for a mistrial based off of two incidents that came up this afternoon during the jury selection during the State's portion of it.

First, I believe that there was a misrepresentation of the burden of proof beyond a reasonable doubt. There is discussion about how -- to walking across the street and 50 percent. And while I may be able to do cleaning up through mine -- I think that the State touched upon it -- but I think that there was misrepresentations as to what their additional burden is.

Additionally, the State's statement that the only person that knows what happened is the defendant and we can't make him testify, I think flies in the face of what the Constitution provides for my client. You have just told every one of these jurors here we

- 10 -

can't make him testify. You can't unring that bell. And I think that my client's not going to get a fair shake in this. They already told them they can't make him testify, and you've tainted the pool, and I'm asking for a mistrial and we will start all over on this.

. . . .

[Prosecutor]: The first one, obviously your instructions will be the letter of the law when it comes to it. I believe we were talking about examples of the difference between civil/criminal, and we were talking about you can't assign a number to reasonable doubt, so I think that's simply a way of getting people to understand what that burden is. And I think we reminded the jurors several times that the burden always remains on the State. It's beyond a reasonable doubt.

The second one with regards to the right to not testify, I believe that came in the context of the example of talking with the mom and the three kids and circumstantial evidence and talking about well -- we talked to [a potential juror] about how she would want to hear from everybody. And my comment was that you understand in this jurisdiction that's not something, unlike what you want to do at home, you won't be able to do that here. So people understand that sometimes that in criminal cases, although you may want to hear from them, the defendant has an absolute right not to testify, and that's the burden which the State has to bear. That was the point I was trying to convey. I don't think -- in the context as I remember it, we were talking about the example of the cookie jar and the three kids and two- and three-year-old, and I don't think it was ever a reference to this defendant. At least that wasn't my intent.

[Defense]: Right. And my concern is that it was coupled with the statement that the only person who knows who did it is the defendant, the defendant. We're not saying the only person -- In your case, [the potential juror] who knew the kids that were involved. We specifically singled out the defendant. [The prosecutor] turned around and looked at the defendant and said, "We can't make him testify." I mean, that's way beyond a line that we cannot uncross that line now.

THE COURT: The first one is not an issue because that could get cleared up easy with instructions, and you can go in yourself. And between civil --

[Defense]: Correct.

THE COURT: -- one over the other and he didn't attempt beyond not all doubt, but reasonable doubt.

But on the other, I think there is a little bit of an issue there in that, because we have a victim, the defendant isn't the only one that knows what happened.

[Defense]: Well, yeah --

THE COURT: We have a victim here. It's not like he is building the case on circumstantial evidence here. We do have a victim that can testify.

[Defense]: But to make it sound like the defendant is the only one who knows what happened and that he's not going to tell you what happened, again, that's -- the wording of the fact that it was coupled in, again, with looking back at the defendant, I just feel like it's -- I don't believe there was any necessary intention or malice in it. But I'm just afraid that with what we've got to work with and the limited number of jurors that we've got in

this room at this time, we're not going to be able to overcome that -- you know, I'm going to have to spend two days explaining to people, you know --

[Prosecutor]: I'm not comfortable with the record reflecting that I looked over towards the defendant because I don't know whether I did.

THE COURT: I don't remember whether that happened or not. The defendant was in the direction --

[Prosecutor]: [The potential juror] is behind the defense table in between the prosecution. That's who I'm talking to.

[Defense]: I understand that. But we all have to, like, tiptoe, and we have to be careful. But it's -- again, the presumption is very distinct and I wrote it down. The only person who knows who did it is the defendant. We didn't say a child. We didn't say a miscellaneous uncharacterized person in the hypothetical with the cookie jar. We said the defendant. And we're putting words and ideas in, and we're already sending a message to the jury that he knows what happened.

THE COURT: It would be better if you said the person that did it.

[Defense]: Yeah. We're sending a signal to the jury that he is guilty, and we can't unring that.

[Prosecutor]: I don't think that's true at all.

THE COURT: I don't know if you saw it there, but I've got the picture of the billboard that says "Just because you did it doesn't mean you're guilty."

[Defense]: Uh-huh.

THE COURT: The motion is overruled. We will see what happens at the end of your voir dire with them and see where they're at. And if you want to talk to them about how they took that or whatever, you know, we may have an issue with it and run out of jurors, and we may have a mistrial.

[Defense]: Okay. All right.

The defense then proceeded with its voir dire and passed the jury for cause. The defense never renewed its motion for mistrial.

(c) Did Burhan Waive any Alleged Error?

The State argues that "[a]t the time the district court overruled Burhan's motion, it did not foreclose the possibility of granting a mistrial but instead agreed to revisit the issue, if necessary, at the conclusion of Burhan's voir dire." Brief for appellee at 16. And that Burhan thereafter addressed his concerns with the prospective jurors and passed the panel for cause. The State argues that "Burhan's failure to renew his motion after completing his voir dire suggested he was satisfied the prospective jurors could be fair and impartial and was no longer interested in disqualifying the entire panel." Id. It is the State's position that Burhan has waived any error with regard to the court's failure to grant a mistrial. In his reply brief, Burhan argues that he did not waive his motion for mistrial, but in the event this court finds otherwise, he asserts that trial counsel provided him with ineffective assistance of counsel for failing to renew the motion for mistrial at the conclusion of jury selection. As we explain below, we ultimately find any error made by the district court in

failing to grant a mistrial based on the prosecutor's comments during voir dire was harmless beyond a reasonable doubt. Therefore, for purposes of our analysis, we will assume that Burhan properly preserved the issue for appeal.

(d) Analysis

In the context of prosecutorial remarks on the defendant's right to remain silent and to not testify, there is a two-part test for determining whether the comments warrant reversal: (1) were the prosecutor's remarks improper, and, if so, (2) was the error harmless beyond a reasonable doubt? See *Griffin v. California*, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965) (the Fifth Amendment forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt); *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt). See, also, *State v. Abram*, 284 Neb. 55, 815 N.W.2d 897 (2012) (recognizing and applying *Chapman* harmless error test); *State v. Harper*, 208 Neb. 568, 304 N.W.2d 663 (1981) (applying *Chapman* harmless error test); *State v. Donald*, 199 Neb. 70, 256 N.W.2d 107 (1977) (considering strength of evidence against defendant, comment by prosecutor on defendant's failure to testify, if error, was harmless beyond reasonable doubt and did not contribute to conviction).

The two-part test set forth above also applies to prosecutorial remarks on the defendant's presumption of innocence. See *Hamilton v. Mullin*, 436 F.3d 1181 (10th Cir. 2006) (any error in prosecutor's "cloak of innocence" statements made during closing argument were harmless beyond reasonable doubt); *State v. Powell*, 682 S.W.2d 112 (Mo. Ct. App. 1984) (prosecutor's remarks during voir dire regarding presumption of innocence correctly stated law and were not improper) (prosecutor's remarks in *Powell* were similar to those made in this case). See, also, *United States v. Soto-Beniquez*, 356 F.3d 1 (1st Cir. 2003).

The two-part test set forth above is likewise applicable to the prosecutorial remarks which Burhan claims mischaracterized the State's burden of proof and incorrectly described reasonable doubt. See *Johnson v. Com.*, 184 S.W.3d 544, 550 (Ky. 2005) (prosecutor's comment during voir dire that "beyond shadow of doubt" was not same as "beyond reasonable doubt," was not impermissible attempt to define reasonable doubt in violation of Kentucky rules and case law; "even if one is convinced that the statement by the prosecutor in this case constituted error, that error was harmless"). See, also, *Kurina v. Thieret*, 853 F.2d 1409 (7th Cir. 1988) (prosecutorial misconduct, in using erroneous definition of presumption of innocence in closing argument, was not substantially prejudicial to petitioner's rights where any effect prosecutor's comments may have had on jury's ability to weigh evidence was negated by trial court's instruction on presumption of innocence).

Burhan challenges several comments made by the prosecutor during voir that he argues infringed on his constitutional right to remain silent and his presumption of innocence. He also challenges comments made by the prosecutor that he contends mischaracterized the State's burden of proof and incorrectly described reasonable doubt. We need not decide whether any of the prosecutor's comments challenged by Burhan were improper because even assuming they were

improper, any errors made by the prosecutor (or by the district court in failing to grant a mistrial based on the prosecutor's remarks) were harmless beyond a reasonable doubt, as we now explain.

In Nebraska, "we are bound by the rule that if there is some incorrect conduct in a jury trial which, on a review of the entire record, did not materially influence the jury in its verdict adverse to a substantial right of the defendant, the error is harmless." *State v. Bradley*, 236 Neb. 371, 378-79, 461 N.W.2d 524, 532-33 (1990). A conviction will not be set aside in the absence of a showing that a nonevidential error prejudiced the defendant. *Id*. Actual prejudice must be shown, rather than merely the possibility of prejudice. *Id.*

In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury; (2) whether the conduct or remarks were extensive or isolated; (3) whether defense counsel invited the remarks; (4) whether the court provided a curative instruction; and (5) the strength of the evidence supporting the conviction. *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014). We consider each of these five factors next.

Applying the first two factors noted above to the instant case, we note that the prosecutor made several remarks on Burhan's right to remain silent and his presumption of innocence, and some additional remarks on the burden of proof and reasonable doubt. These remarks could have influenced the jury; particularly the remarks that it is "natural" to want to know what the defendant has to say.

As for the third factor, defense counsel certainly did not invite any improper remarks made by the prosecutor. And during her voir dire, defense counsel attempted to rehabilitate any adverse effects of those remarks. She emphasized that the burden was on the State to prove its case, and that the defense did not have to call a single witness. She reminded the potential jurors that Burhan was presumed innocent, and the fact that he was charged with various crimes was evidence of nothing. She also reiterated that Burhan did not have to testify and that it cannot be held against him. Defense counsel told the jury that if they went back to the jury room at that point, the verdict would have to be that Burhan was innocent, because no evidence had been presented and he was presumed innocent.

With regard to the fourth factor, the court did not provide a curative instruction during voir dire. However, before the case was submitted to the jury, the court instructed the jury as follows: Burhan had an absolute right not to testify and the fact that he did not testify must not be considered as an admission of guilt and must not influence the verdict in any way; Burhan was presumed innocent, and the presumption of innocence continues throughout the trial until he shall have been proved guilty beyond a reasonable doubt; the burden of proof is always on the State to prove beyond a reasonable doubt all of the material elements of the crimes charged; and a reasonable doubt is one based upon reason and common sense after careful and impartial consideration of all the evidence--it is proof so convincing that you would rely and act upon it without hesitation in the more serious and important transactions of life.

While defense counsel's rehabilitative voir dire and the final jury instructions given by the court helped to "cure" the possible prejudicial effect of the prosecutor's comments during voir dire, we conclude that the most significant factor in the harmless error analysis in this case comes

- 14 -

from the final factor - the strength of the evidence supporting the convictions. In *Dubray*, *supra*, even though our Supreme Court concluded that a prosecutor's remarks during a trial had "no place in the courtroom and constitute misconduct," the prosecutor nevertheless "dodged a reversal" because the improper arguments did not deprive the defendant of a fair trial because the misconduct did not permeate the trial and the evidence against the defendant "was strong." *Dubray*, 289 Neb. at 228, 854 N.W.2d at 605.

We conclude the strength of the evidence in this case similarly overcomes any possible prejudicial effect of the prosecutor's comments during voir dire. Albrecht testified that she picked Burhan up at a gas station (supported by the store's surveillance video). She testified that after driving to a residential neighborhood, Burhan punched her in the face and shot her three times before he stole her purse and her car; Sanchez heard the gunshots, police arrived on-scene to find Albrecht with three gunshot wounds, and shell casings were found in the street. Burhan was found with Albrecht's car a little more than an hour later; no one else was nearby. In addition to being with the vehicle, Burhan was holding a garbage bag containing, among other items, a long-sleeved gray shirt with "apparent" blood; a gray T-shirt; jeans with "apparent" blood; and white shoes with "possible" blood. The clothes in Burhan's possession matched the description of the suspect's clothing provided by Albrecht (who said Burhan was wearing a gray short-sleeved T-shirt and jeans) and Sanchez (who said the person who drove away from the scene in the Nissan was wearing a gray jacket), as well as clothing seen in the gas station's surveillance video (which showed a man wearing pants, a long-sleeved shirt, and white shoes). The garbage bag also contained a beef and cheese wrapper, and an energy drink--items Albrecht had purchased at the gas station while waiting for Burhan. Additionally, at the time of his arrest, Burhan had a partially smoked cigarette on his person; this coincided with Albrecht's testimony and surveillance video that just prior to getting in Albrecht's car at the gas station, Burhan had extinguished his cigarette.

Burhan told the police that he was walking by the carwash when some guy offered to sell him the clothing and other items, but his story seems implausible considering the great weight of the evidence against him. And his attempts to question Albrecht's character (e.g. her gambling habit and electronics business) and credibility (she stated that she personally called 911 after the incident, but her phone records show no such call) do not significantly challenge the great weight of the evidence against him. Given the strong nature of the evidence, any errors made by the prosecutor (or by the district court in failing to grant a mistrial based on the prosecutor's remarks) were harmless beyond a reasonable doubt.

We digress a moment to note that Burhan relies upon *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989), to support his argument that he was denied a fair trial because of the prosecutor's comments related to Burhan's right to remain silent at trial. In *Pierce*, supra, the Nebraska Supreme Court found that a prosecutor's comment during opening statement regarding the defendant's right not to testify was prejudicial and prevented a fair trial; the court found that Pierce's motion for mistrial should have been granted under the circumstances. During opening statements, the prosecutor told the jury that Pierce "'will testify but we do not know which version of the facts to which he will testify.'" *Id*. at 978, 439 N.W.2d at 444. Our Supreme Court referred to cases from other jurisdictions where similar remarks were found to be improper and then said:

The prosecutor's remark immediately made Pierce's credibility an issue in the case before introduction of any evidence. Moreover, the prosecutor's remark presented a dilemma: Pierce could remain silent and thereby give credence to, or even substantiate, the invidious innuendo that he had previously given inconsistent versions of the incident on which the criminal charge was based, or Pierce could take the witness stand and recount a version without any inconsistency, thereby responding to the prosecutor's intimation of inconsistency but subjecting himself to cross-examination.

*Id.* at 979, 439 N.W.2d at 444. The court concluded that the prosecutor's statement compelled Pierce to testify and was a violation of his constitutional right to remain silent. However, the Court continued by saying "We do not decide whether any appropriate cautionary instruction might have eliminated the prejudice from the prosecutor's statement inasmuch as no instruction was given concerning the prosecutor's comment." *Id.* at 979, 439 N.W.2d at 445.

Our case is distinguishable from *Pierce, supra*, because although the trial court did not provide a curative instruction during voir dire, it did instruct the jury on Burhan's right not to testify before the case was submitted to the jury. And as we explained previously, such an instruction contributes to our finding that any impropriety in the prosecutor's remarks during voir dire was harmless beyond a reasonable doubt. Further distinguishing this case from *Pierce* is that the prosecutor did not affirmatively state that Burhan would testify nor did the prosecutor make Burhan's credibility an issue. See *State v. McMillion*, 23 Neb. App. 687, 713, 875 N.W.2d 877, 903 (2016) ("The dangers from *Pierce* are not present in the instant case. The State referenced that McMillion *may* take the stand and *may* tell 'her ... stories,' whereas the prosecution in *Pierce* affirmatively asserted that the defendant would testify.") Having found *Pierce, supra*, distinguishable, we reiterate our finding that given the strong nature of the evidence in this case, any errors made by the prosecutor (or by the district court in failing to grant a mistrial based on the prosecutor's remarks) were harmless beyond a reasonable doubt.

## 2. SUFFICIENCY OF EVIDENCE

Burhan was convicted of five crimes: Count 1, robbery, pursuant to § 28-324; Count 2, use of a deadly weapon (firearm) to commit a felony, pursuant to § 28-1205; Count 3, possession of a firearm by a prohibited person, pursuant to § 28-1206; Count 4, second degree assault, pursuant to § 28-309; and Count 5, use of a deadly weapon (firearm) to commit a felony, pursuant to § 28-1205.

Burhan argues there was insufficient evidence as to all counts; his claim is essentially that Albrecht was not a credible witness. However, in reviewing a criminal conviction for a sufficiency of the evidence claim, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question when an appellate court reviews a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Jones*, 293 Neb. 452, 878 N.W.2d 379 (2016). Moreover, Albrecht's version of events was corroborated

by ample evidence, including surveillance video, other witnesses, and various items found in Burhan's possession at the time of his arrest.

### (a) Counts 1 and 2

Pursuant to § 28-324, "[a] person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever."

Albrecht testified that Burhan punched her in the face three times, "used profanity and told [Albrecht] that he was taking [her] purse." When she refused to hand over her purse, Burhan pulled out a gun. Burhan demanded that she get out of the vehicle. After Albrecht exited her vehicle, Burhan drove away in her vehicle; and he was found in possession of the vehicle a little more than one hour later. Clearly, there was sufficient evidence to convict Burhan of robbery.

And pursuant to § 28-1205(1) "[a]ny person who uses a firearm . . . to commit any felony which may be prosecuted in a court of this state commits the offense of use of a deadly weapon to commit a felony"; and "[u]se of a deadly weapon, which is a firearm, to commit a felony is a Class IC felony." Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Burhan of use of a firearm to commit a felony (in this case, robbery).

### (b) Count 3

Pursuant to § 28-1206(1)(a), "[a]ny person who possesses a firearm . . . and who has previously been convicted of a felony . . . commits the offense of possession of a deadly weapon by a prohibited person."

The parties in this case stipulated that on August 5, 2014, Burhan was a "prohibited person" as defined by statute due to a prior felony conviction. See Exhibit 132. Thus, the only question is whether Burhan possessed a firearm on August 5. Albrecht testified that Burhan pulled out a gun while they were struggling over her purse; she testified that he subsequently shot her three times. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Burhan of possession of a firearm by a prohibited person.

### (c) Counts 4 and 5

Pursuant to § 28-309(1)(a), a person commits the offense of assault in the second degree if he or she "[i]ntentionally or knowingly causes bodily injury to another person with a dangerous instrument."

As stated previously, Albrecht testified that Burhan shot her three times while trying to steal her purse and her car. When she reached for her phone and grabbed for the handle of the door so she could get out, Burhan fired the first shot, which grazed her right thigh. Albrecht was still trying to get out of the vehicle when Burhan fired the second shot, which went in and out of her left calf. She was halfway out of the car when Burhan grabbed her right arm, pulled it back inside the vehicle, put the gun up to her right wrist, and fired a third shot. Viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Burhan of assault in the second degree.

Furthermore, and again viewing the evidence in the light most favorable to the State, there was sufficient evidence to convict Burhan of use of a firearm to commit a felony (in this case, assault in the second degree).

### 3. EXCESSIVE SENTENCE

Burhan asserts that the district court imposed excessive sentences. When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

Burhan was 40 years old at the time of the crimes and 41 years old at the time of sentencing. He was single, but in a long-term relationship, and has one child. Burhan has an associate's degree in graphic communications and design. According to the presentence investigation, Burhan was unemployed due to his incarceration. Prior to his arrest, Burhan was employed by Regis, doing inventory and auditing for stores that contracted with the company.

Burhan's criminal history consists of convictions for possession of a controlled substance - crack cocaine (twice), possession with intent to deliver a controlled substance, "Possession/Purchase/Cocaine Base/Sale," "Make/Pass Fictitious Check," and escape from work release. He has been placed on probation in the past, and had his probation revoked twice. And when he escaped from work release, he was not located for nearly 7 years. As to his current offenses, he robbed a woman and shot her three times. As part of the presentence investigation for his current convictions, the probation office conducted a Level of Service/Case Management Inventory, which assessed Burhan in the high risk category for recidivism. The probation office recommended a "lengthy straight sentence of incarceration."

In his brief, Burhan argues that the district court did not properly weigh and consider the relevant sentencing factors. However, the record shows that the district court heard argument from Burhan's attorney regarding Burhan's background, and heard from Burhan's long-term girlfriend who described Burhan as "a good man." Additionally, the court had a lengthy discussion with Burhan himself. The district court noted that Burhan's criminal record did not indicate any violence, but that "when [Burhan] went violent, [he] went all the way, except for . . . not getting charged with murder, because [the victim] was not wounded to that extreme, but . . . these are serious charges and they kind of overlook how it happened."

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Dixon, supra*. And it is the minimum portion of an indeterminate sentence which measures its severity. *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990).

Burhan was sentenced to imprisonment for 10 to 15 years for robbery, a Class II felony (Count 1); 10 to 10 years for possession of a firearm by a prohibited person, a Class ID felony (Count 3); 20 to 20 years for second degree assault, a Class III felony (Count 4); and 5 to 10 years for each use of a deadly weapon (firearm) to commit a felony, each a Class IC felony (Counts 2 and 5). The court ordered the sentences in Counts 1, 3, and 4 to be served concurrently with each

other, the sentence in Count 2 was to be served consecutively to the sentence in Count 1, and the sentence in Count 5 was to be served consecutively to the sentence in Count 4.

Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014) establishes the following felony sentences: a mandatory minimum of 5 and up to 50 years' imprisonment for a Class IC felony; a mandatory minimum of 3 and up to 50 years' imprisonment for a Class ID felony; 1 to 50 years' imprisonment for a Class II felony; and 1 to 20 years' imprisonment, a $25,000 fine, or both for a Class III felony.

Other than the sentence for second degree assault, the minimum portions of all of Burhan's sentences were in the low-range of the permissible sentencing ranges, and three of the five charges were ordered to be served concurrently. Having considered the relevant factors in this case, we find that the sentences are not excessive or an abuse of discretion and such sentences are therefore affirmed.

### 4. SENTENCING CREDIT

Burhan was given credit for 295 days' time served "against sentences imposed under Counts 1, 3, and 4." Burhan argues that the district court erred in failing to award him credit for 295 days' time served against Counts 2 and 5 (Burhan said Counts 2 and 4 in his brief, but we assume he meant Counts 2 and 5 since those were the counts he was not given credit against). We do not agree. The Nebraska Supreme Court has explained that

> [a]lthough under Neb. Rev. Stat. § 83-1,106 (Reissue 2014), an offender shall be given credit for time served as a result of the charges that led to the sentences, *presentence credit is applied only once. Therefore, when consecutive sentences are imposed for two or more offenses, periods of presentence incarceration may be credited only against the aggregate of all terms imposed.*

*State v. Custer*, 292 Neb. 88, 116-17, 871 N.W.2d 243, 264 (2015) (emphasis supplied). In our case, Burhan received 295 days' credit on his aggregate sentence when he was given credit against the three concurrent counts (Counts 1, 3, and 4); since the credit can only be applied once, he was not entitled to credit against his consecutive sentences (Counts 2 and 5). Having found that the presentence credit was applied properly, we affirm the court's sentencing order.

### 5. CUMULATIVE ERROR DOCTRINE

Burhan also argues the accumulation of errors in this case are such that even if any one error does not require reversal, the aggregation of errors requires his convictions be reversed and the case remanded for a new trial. The Nebraska Supreme Court has recognized the doctrine of cumulative error in the context of a criminal jury trial, stating that "while one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect was to deprive the defendant of his constitutional right to a public trial by an impartial jury." *State v. Smith*, 286 Neb. 856, 893, 839 N.W.2d 333, 363 (2013) (internal quotations omitted). Given our resolution of Burhan's other assigned errors in this case, we find no error with regard to the cumulative error doctrine.

6. INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Newman*, 290 Neb. 572, 861 N.W.2d 123 (2015). To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *State v. Vanderpool*, 286 Neb. 111, 835 N.W.2d 52 (2013). To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Newman, supra*. An appellate court may address the two prongs of this test, deficient performance and prejudice, in either order. *Id*.

Burhan obtained new counsel for this direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Newman, supra*. Otherwise, the issue will be procedurally barred. *Id*. However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id*. The determining factor is whether the record is sufficient to adequately review the question. *Id*. An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *Id*.

Burhan argues that his trial counsel was ineffective because counsel (1) failed to obtain and present DNA evidence in his defense, (2) failed to obtain and present GSR evidence in his defense, (3) failed to elicit evidence regarding Burhan's lack of motive to commit the offense in dispute, and (4) failed to present Burhan's defense.

Burhan argues that his trial counsel was aware that the OPD did not conduct DNA or GSR testing in his case and rather than obtaining such evidence, counsel relied on the "lack of DNA [and GSR] results in order to attempt to acquit Burhan." Brief for appellant at 24-25. Because these claims implicate matters of trial strategy, they cannot be determined on the record before us.

Burhan argues that his trial counsel failed to offer evidence regarding his lack of motive to assault/rob Albrecht. He claims that

> [t]rial counsel did not adduce evidence in any form during trial regarding events or on-goings in Albrecht's past, e.g., her self-reported victimization of ten (10) to twelve (12) robberies, whether any of those events were related to her prior felony conviction, whether any of those were related to her gambling addiction, and whether any of those events involved her not-for-profit pawn operation, that would have suggested to the jury that someone other than Burhan had a motive to assault/rob Albrecht and that Albrecht had a motive to report the events of August 5, 2014, in an untruthful manner.

Brief for appellant at 26. As stated previously, there was sufficient evidence to show that Burhan was the one who robbed and assaulted Albrecht, and it is immaterial whether someone else may have also had motive to rob and assault her. Furthermore, trial counsel cross-examined Albrecht regarding her gambling, her history of loaning people money, and her taking electronics as

collateral and selling them. Accordingly, Burhan cannot show that trial counsel was deficient or that he was prejudiced.

Finally, Burhan argues that trial counsel was ineffective for failing to "present a defense case in chief," and "[t]he reasons therefore may be inferred from the record of the [sic] Burhan's sentencing proceeding . . . and during which it is clear that trial counsel and Burhan had a substantial difference of opinion regarding the presentation of Burhan's defense." Brief for appellant at 26-27. Our review of the record reveals that Burhan continued to proclaim his innocence at the sentencing hearing and argued for his conviction to be overturned. During that hearing, he claimed that Albrecht was the "criminal in this matter whom the police department and the County Attorney's Office have neglected to pursue"; he claimed that he, not Albrecht, was the victim on August 5, 2014 (he said that Albrecht was an escort who had been harassing him for some time and had tried to rob him of $1,000 on August 5). The court told him that it was not the proper time or place to make such arguments. Burhan said he "[had] not been able to be heard," "[t]his whole time that I have been arrested, every time I have tried to speak, I get the same reaction," and "[i]t wasn't when I was on attorney visits, it wasn't when I was on attorney phone calls[,] [i]t never was the right time." Because Burhan's claim that trial counsel was ineffective for failing to "present a defense case in chief" implicates matters of trial strategy and potentially implicates privileged communications between Burhan and his trial counsel, it cannot be determined on the record before us.

## VI. CONCLUSION

For the reasons stated above, we affirm Burhan's convictions and sentences.

AFFIRMED.